**In re Jackie L. BUNDICK, Debtor.**

**Stanford M. & Gladys L. Beckett, Plaintiffs,**

v.

**Jackie L. Bundick, Defendant.**

**Bankruptcy No. 02–75994–SCS. Adversary No. 02–7160–SCS.**

United States Bankruptcy Court, E.D. Virginia, Norfolk Division.

Dec. 17, 2003.

Gregory K. Pugh, Gregory K. Pugh, P.C., Virginia Beach, VA, for Debtor.

John D. McIntyre, Kimberly L. Stegall, Willcox & Savage, P.C., Norfolk, VA, for Plaintiffs.

## MEMORANDUM OPINION AND ORDER

STEPHEN C. ST. JOHN, Bankruptcy Judge.

This matter came on for hearing September 23, 2003, on the Plaintiff's Motion for Summary Judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, made applicable to these proceedings by Rule 7056 of the Federal Rules of Bankruptcy Procedure. At the conclusion of the hearing, the Court took this matter under advisement. This Court has jurisdiction over these proceedings pursuant to 28 U.S.C. §§ 157(b) and 1334(b). Venue is proper pursuant to 28 U.S.C. § 1409(a). Upon consideration of the arguments presented by counsel at the hearing and of the

pleadings and memoranda submitted by each party, and for the reasons stated below, the plaintiffs' Motion for Summary Judgment is granted.

## I.

### FACTS

Jackie L. Bundick ("Bundick") filed a Bankruptcy Petition under Chapter 7 of the Bankruptcy Code on September 6, 2002. This adversary complaint was initiated on December 12, 2002 when Stanford M. Beckett ("Mr. Beckett") and Gladys L. Beckett ("Mrs. Beckett") (collectively known as "the Becketts") filed a Complaint to Determine Dischargeability of Debt (the "Complaint") against Bundick. The Complaint alleges that Bundick is indebted to Mrs. Beckett for $35,000.00 and to Mr. Beckett for $15,000.00 by virtue of a judgment entered by the Circuit Court for Northhampton County, Virginia. Compl. ¶ 21. The Circuit Court judgment, a copy of which was filed with the Complaint, entered a judgment comprised of three separate awards:

(1) $25,000.00 to Mrs. Beckett for compensatory damages;

(2) $10,000.00 to Mrs. Beckett for punitive damages;

(3) $15,000.00 to Mr. Beckett for compensatory damages.

*Beckett v. Bundick,* Chancery No. CH–0071 (Va.Cir., May 21, 2002). A copy for the transcript of the trial of the State Court Action was attached as Exhibit "C" to the Becketts' Complaint.[1]

The Complaint alleges that Bundick and the Becketts own neighboring properties in Exmore, Virginia. Bundick has resided at 6060 Bayside Road, Exmore, Virginia

since approximately 1987. The Becketts have resided at 6052 Bayside Road, also in Exmore, Virginia since 1973. Compl. ¶ 7.

According to the Complaint, in 1987 Bundick began to use his property on Bayside Road to perform mechanical repairs on cars and light trucks. Compl. ¶ 8. Sometime in 1996 Bundick expanded his repair operations to include maintaining and repairing heavy diesel trucks, commonly known as 18–wheelers. Compl. ¶ 9. As a result of this truck repair operation, Bundick began dumping used motor oil and used transmission fluid on his property, near the property line and on the Beckett's property. Compl. ¶ 10. Furthermore, it was alleged that Bundick regularly operated the engines of various large vehicles and left the vehicles running for up to five hours and that vehicles were started as early as 3:00 a.m. and as late as 12:00 midnight. Compl. ¶ 11. As a result of this conduct, the Becketts claim that they suffered severe damage to their property and that Mrs. Beckett suffered injury to her health. Compl. ¶ 12. The Becketts finally allege that Bundick willfully and maliciously injured the Becketts by operating his business in a harmful manner. Compl. ¶ 24. The Becketts therefore prayed that Bundick's indebtedness to the Beckett's of $50,000.00 be declared nondischargeable under § 523(a)(6) of the Bankruptcy Code.

Bundick filed an answer in the adversary proceeding on January 3, 2003. The answer admitted many of the allegations contained in the Complaint, but denied paragraphs 9, 10, 11, 12, 19, 24, 25, and 26 of the Complaint, including allegations that he had expanded his business operations in 1996, dumped motor oil or transmission fluid on his or the Becketts' property,

---

1. The transcript of the State Court trial was appended as an exhibit to the Motion for Summary Judgment of the Becketts and its accuracy and authority was not contested by Bundick.

harmed the Becketts in any manner or continued his business operations in violation of an injunction issued by the Circuit Court of Northhampton County. Bundick denied that his actions constituted a willful and malicious injury to the Becketts and prayed that this Court dismiss the Complaint. The Becketts have now moved for summary judgment pursuant to Rule 7056 of the Federal Rules of Bankruptcy Procedure.

## II.

## THE STATE COURT ACTION

Given the Becketts' theory that summary judgment is appropriate, the form of the state court pleadings, the record of the state court trial and the outcome of the Northhampton County Circuit Court chancery suit are critical to the disposition of this motion.

On October 31, 2000, the Becketts filed a Bill of Complaint (the "Bill of Complaint") in the Circuit Court for Northhampton County, Virginia ("State Court") based on the alleged harm caused by Bundick's truck repair operation ("State Court Action"). The Bill of Complaint named both the debtor and his spouse, Julia H. Bundick, as defendants and alleged five causes of action: 1) intentional infliction of emotional distress; 2) negligence; 3) nuisance; 4) trespass; and 5) injunctive relief.

The Bundicks did not file an answer and on December 1, 2000 the Becketts filed a motion for the entry of default judgment. Compl. ¶ 15. On January 5, 2001, the Bundicks filed a motion for leave to file a late answer. Compl. ¶ 16. On February 12, 2001 the State Court extended the filing deadline to February 16, 2001. In addition to extending the filing

deadline, Judge Tyler of the State Court issued a temporary injunction ("the temporary injunction") prohibiting Bundick from "performing any welding, maintenance, or repair, or allowing any welding, maintenance, or repair" on the property of the Bundicks. Temporary injunction, p. 1.[2] That court further enjoined the Bundicks from "running, operating, and/or using any diesel or gasoline engines, welding equipment of any sort, and any other power equipment of any sort—regardless of whether such engine, welding equipment, or power equipment is powered by electricity, internal combustion engine, chemical reaction, or any other source of power—at, upon, above, around, or near Respondent's Property." Narrow exceptions for personal vehicles and lawn mowers were allowed by the temporary injunction, which was to last for the entire pendency of the litigation. Temporary injunction, p. 2. Bundick filed an answer to the Bill of Complaint on February 13, 2001. Compl. ¶ 19.

At the trial held January 29, 2002, the State Court issued a permanent injunction prohibiting the Bundicks from operating his business and held that the Becketts were entitled to damages. Tr. at. 196–203. On May 21, 2002 the Circuit Court entered an Order (the "Final Order") in favor of the Beckett's for $50,000.00. Mrs. Beckett was awarded total damages of $35,00.00; $25,000.00 in compensatory damages and $10,000.00 in punitive damages. Mr. Beckett was awarded $15,000.00 in compensatory damages. Final Order, ¶ 2. Judge Tyler also incorporated the permanent injunctions against Bundick issued at the trial on January 29, 2002 into the final order. Final Order, ¶ 1.

2. Bundick apparently consented to the provisions of the temporary injunction as the record of the State Court Action indicates the temporary injunction entered by Judge Tyler was an Agreed Order.

## III.

## THE MOTION FOR SUMMARY JUDGMENT

A Motion for Summary Judgment is governed by Rule 7056 of the Bankruptcy Code, which incorporates Federal Rule of Civil Procedure 56 in adversary proceedings. In order to determine if there is any genuine issue as to any material fact the Court may consider pleadings, answers to interrogatories, admissions, and any affidavits filed with the court. If there is no material issue of fact then the moving party is entitled to judgment as a matter of law and summary judgment is appropriate. *Celotex v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

The Becketts' Motion for Summary Judgment relies entirely on the findings of the State Court and the resulting judgment against Bundick. The Becketts argue that the findings of Judge Tyler in the State Court show that Bundick's actions were willful and malicious and therefore render the judgment debt non-dischargeable under Bankruptcy Code § 523(a)(6). Beckett Br., p. 9. The Becketts argue that this Court is bound by the doctrine of collateral estoppel and cannot make an independent evaluation of whether Bundick's conduct was willful and malicious. Furthermore, the Becketts argue that since both the compensatory and punitive damages awarded by Judge Tyler arose from the same set of facts, both the compensatory and punitive damages are non-dischargeable.

Bundick's Brief in Opposition to the Motion for Summary Judgment argues two major points, first that the State Court judgment is insufficient under § 523(a)(6) to make the debt to the Beckett's non-dischargeable, and second that the awards must be analyzed separately to determine dischargeability. Bundick initially argues that the damages awarded by the State Court were based on a finding that nuisance existed, rather than conduct amounting to a willful and malicious injury and therefore do not fall within the ambit of § 523(a)(6). At oral argument, counsel for Bundick argued that there was insufficient evidence presented at trial to justify a finding of willful and malicious behavior.

Secondly, Bundick argues that this Court must analyze the various components of the judgment separately with regard to Mr. Beckett and Mrs. Beckett and as to compensatory and punitive damages. Bundick claims that the award of compensatory damages to Mr. Beckett is insufficient to support a finding of non-dischargeability since there was no evidence of physical harm to Mr. Beckett presented at trial. Bundick Br., p. 3. Bundick also claims that the award of compensatory damages Mrs. Bundick should not be exempted from discharge under § 523(a)(6) since there was no showing at trial that Bundick acted with the intent and the desire to physically injure Mrs. Beckett. Bundick Br., p. 4. Finally, Bundick argues that the punitive damages award should be not be exempted from discharge, since the actual basis for the punitive damages was a violation of an injunction, rather than any intentional injury to the Becketts. Bundick Br., p. 5.

The Beckett's rebuttal brief argues that judgments based on a nuisance theory can be sufficient under Virginia law to fall within the ambit of § 523(a)(6) and that the Circuit Court's findings supported such a result in this case. The Becketts also argue that the injuries suffered by both Mr. and Mrs. Beckett are sufficient to impose the exemptions of § 523(a)(6) and that the punitive damages award is non-dischargeable since it arises from the same conduct which resulted in compensatory damages.

## IV.

## CONCLUSIONS OF LAW

### A. Summary Judgment

In determining whether to grant summary judgment to a moving party, the Court looks to Rule 56(c) of the Federal Rules of Civil Procedure, which is made applicable to this proceeding by Federal Bankruptcy Rule 7056. Fed. R. Bankr P. 7056. Under Rule 56, the Court will grant summary judgment if two elements are proven. First, "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact." Fed.R.Civ.P. 56(c). The second requirement is that "the moving party is entitled to judgment as a matter of law." *Id.*

"The burden of establishing the nonexistence of a genuine issue of material fact rests on the moving party" and is proved by a preponderance of the evidence. *Maryland Highways Contractors v. State of Md.,* 933 F.2d 1246, 1252 (4th Cir.1991); *In re Speaks,* 193 B.R. 436, 440 (Bankr.E.D.Va.1995)(citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1985)). "In considering a motion for summary judgment, the Court should draw all inferences from the underlying facts in a light most favorable to the nonmoving party." *In re Speaks,* 193 B.R. at 440 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)).

In determining whether to grant summary judgment, the Court is presented with several interpretations of the Rule 56 elements. With respect to the first element that there not be a genuine issue of material fact, the Supreme Court has defined a "material fact" as one that might affect the outcome of the suit. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). With respect to the second requirement that the moving party be "entitled to judgment as a matter of law," it is essential to recall that summary judgment is only appropriate if "there can be but one reasonable conclusion as to the verdict." *In re Galeski Optical,* 169 B.R. 360, 362 (Bankr.E.D.Va.1994)(citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). Also, the Court will not grant summary judgment if "reasonable minds could differ as to the import of the evidence." *Id.* ("If reasonable minds could differ as to the import of the evidence, however, a verdict should not be directed.").

### B. Collateral Estoppel

The Becketts argue that the doctrine of collateral estoppel mandates the judgment debt against Bundick be declared non-dischargeable, based on the findings of Judge Tyler in the State Court Action. There are four different findings contained in the transcript of the State Court action that the Beckett's urge this Court to adopt and utilize to declare the debt non-dischargeable: 1) that Bundick engaged in improper conduct; 2) that Bundick knew that his conduct was improper; 3) that Bundick knew that his actions would cause injury to the Becketts; and 4) that Bundick's conduct did, in fact, injure the Becketts. Beckett Br., p. 9.

It is clear that the doctrine of collateral estoppel applies in bankruptcy proceedings. *Grogan v. Garner,* 498 U.S. 279, 285, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991); *In re McNallen,* 62 F.3d 619, 624 (4th Cir.1995). In *Grogan,* the Supreme Court held that collateral estoppel may supply the basis for a finding of non-dischargeability of a debt based on a prior decision by another court if the standard of proof in the case leading to the judg-

ment debt was proof by a preponderance of the evidence or another, higher standard of proof. *Id.* at 287, 111 S.Ct. 654. Collateral estoppel, also referred to as "issue preclusion," is a subset of the general doctrine of *res judicata* and applies where the second action between the same parties is based upon a different cause of action. *In re Lucas,* 186 B.R. 67, 69 (Bankr.E.D.Va.1995); *Glasco v. Ballard,* 249 Va. 61, 62, 452 S.E.2d 854, 855 (1995) ("the doctrine of collateral estoppel applies even where the subsequent proceeding involves a different claim for relief."). Therefore, this Court is bound by the factual determines made in the prior state court action where collateral estoppel applies. *Ramsey v. Bernstein (In re Bernstein),* 197 B.R. 475, 478, *aff'd* 113 F.3d 1231 (4th Cir.1997).

The important distinction between *res judicata* and collateral estoppel is that "res judicata forecloses all issues that could have been litigated previously" while "collateral estoppel treats as final only those questions actually and necessarily decided in a prior suit.'" *In re Lucas,* 186 B.R. at 69, citing *Brown v. Felsen,* 442 U.S. 127, 99 S.Ct. 2205, 60 L.Ed.2d 767 (1979). If proven, collateral estoppel will preclude the relitigation of a specific fact or issue that was decided in a prior final judgment which involved a different cause of action. *Reid v. Ayscue,* 246 Va. 454, 455, 436 S.E.2d 439, 440 (1993).

When a prior judgment rendered in a state court is the predicate for the invocation of one of the Bankruptcy Codes preclusion doctrines, 28 U.S.C. § 1738 [3] requires that a federal court apply the law of the original forum state to determine the preclusive effect of the prior decision.

*Marrese v. American Academy of Orthopaedic Surgeons,* 470 U.S. 373, 380, 105 S.Ct. 1327, 84 L.Ed.2d 274 (1985); *Kremer v. Chemical Construction Corp.,* 456 U.S. 461, 481–82, 102 S.Ct. 1883, 72 L.Ed.2d 262 (1982); *Allen v. McCurry,* 449 U.S. 90, 96, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980); *McNallen,* 62 F.3d at 624. Accordingly, when deciding the preclusive effect of a judgment issued in a federal court, other federal courts may look to the common law and the policies supporting *res judicata* and collateral estoppel. When analyzing the effect of the doctrines of *res judicata* and collateral estoppel on a state court judgment, however, Congress has specifically required that all federal courts determine the preclusive effect of state court judgments based solely law of the state issuing the judgment. *McCurry,* 449 U.S. at 96, 101 S.Ct. 411; *see also Robi v. Five Platters, Inc.,* 838 F.2d 318, 322 (9th Cir. 1988). Therefore, if Virginia courts would grant preclusive effect to the judgment of the State Court, this court must also do so.

The Virginia case law with respect to collateral estoppel is represented by *TransDulles Center, Inc. v. Sharma,* 252 Va. 20, 472 S.E.2d 274 (1996). In stating that the "Virginia law on collateral estoppel is clear," the Virginia Supreme Court identified five elements necessary for collateral estoppel to apply *Id.,* 252 Va. at 22, 472 S.E.2d at 275. First, the issue litigated must have been essential to the prior judgment. *Id.* Second, the prior action must have resulted in a valid and final judgment against the party sought to be precluded in the present action. *Id.* Third, the parties or privies in both the proceedings must be the same. *Id.* Fourth, there

---

**3.** Known as the "full faith and credit statute," this law, in part, provides:
 "...judicial proceedings [of any court of any ... State] ... shall have the same full faith

and credit in every court within the United States ... as they have by law or usage in the courts of such state ... from which they are taken."

must be mutuality between the parties. *Id.* Finally, the factual issue litigated actually must have been litigated in the prior action. *Id.* As with *res judicata*, the defendants have the burden of proving by a preponderance of the evidence that the elements of collateral estoppel have been established. *Reid,* 246 Va. at 455, 436 S.E.2d at 440. This Court will consider each of these factors, reserving for last the critical determination of whether the issues that the plaintiffs seek to preclude were essential to the state court judgment.

### 1. Valid and Final Judgment

The Virginia Supreme Court has stated that:

A plea of res judicata or estoppel of record may be successfully invoked upon a final judgment or decree of a court of inferior or limited jurisdiction, as well as upon the judgment or decree of a court of record of general jurisdiction, provided the inferior court had jurisdiction of the parties and of the subject matter.

*Petrus v. Robbins,* 196 Va. 322, 329, 83 S.E.2d 408, 412 (1954).

In this case, the order of the Northhampton Circuit Court dated May 21, 2002 is the final order of that court. The last sentence of the order states "[t]his Order represents the final Order of the Court in this matter." Additionally, the Virginia Supreme Court has declined to hear Bundick's writ of appeal on the case, effectively ending the litigation. Therefore, based on the guidelines provided by the Virginia Supreme Court in *Petrus* and the language of the Circuit Court order, the Court concludes that the May 21, 2002 order is a valid and final judgment. Therefore, this element of collateral estoppel is met.

### 2. Same Parties or Privies

For collateral estoppel to apply, the parties or their privies must be the same in the matter before this Court as in the State Court Action. *See TransDulles Center,* 252 Va. at 22, 472 S.E.2d at 275. The parties in this case are nearly identical to the Northhampton Circuit Court case. Mrs. Bundick is the only party involved in the original action who is not a party to this adversary proceeding. Based on these facts, this Court concludes that the parties or privies in the original action are the same as the parties in the action currently before the Court. The burden of proving that this element of collateral estoppel, therefore, has been met.

### 3. Mutuality

In Virginia, collateral estoppel requires mutuality. *Norfolk & Western Ry. v. Bailey Lumber Co.,* 221 Va. 638, 272 S.E.2d 217 (1980); *Selected Risks Insurance Co. v. Dean,* 233 Va. 260, 264, 355 S.E.2d 579, 581 (Va.1987)("this Court made a considered, unanimous decision to resist the so-called 'modern trend' and not to abrogate the mutuality requirement."). Mutuality means that a party is generally prevented from invoking the preclusive force of a judgment unless that party would have been bound had the prior litigation of the issue reached the opposite result. *TransDulles Center,* 252 Va. at 22, 472 S.E.2d at 275. (citing *Norfolk & Western Ry.,* 221 Va. at 639, 272 S.E.2d at 218).

The question of whether there is mutuality here is predetermined because the Court has already held that the parties are the same as in the original action. If the parties are the same, there is mutuality. *Angstadt v. Atlantic Mutual Ins. Co.,* 249 Va. 444, 447, 457 S.E.2d 86, 88 (1995) ("Clearly, because [the first party] was not a party to the prior litigation, it would not have been bound had an opposite result been reached."). Because the Court has determined, *supra,* that the parties are virtually identical, the Court reaches the logical conclusion that both parties are

equally bound by the prior litigation. Therefore, the Court concludes that mutuality exists, and, consequently, this element of collateral estoppel has been established.

### 4. Factual Issue Actually Litigated

 In order for the doctrine of collateral estoppel to apply, "[t]he factual issue sought to be litigated must have been litigated in the prior action." *TransDulles Center*, 252 Va. at 22, 472 S.E.2d at 275. An issue is actually litigated and collateral estoppel applies if a party had a "full and fair opportunity to litigate" the issue and the issue was determined by a court. *Allen v. McCurry*, 449 U.S. 90, 95, 101 S.Ct. 411, 66 L.Ed.2d 308; see also *In re McNallen*, 62 F.3d at 624. This Court has found that "[t]he purpose behind the requirement that an issue be actually litigated is that collateral estoppel should apply only to issues actually litigated and determined by a court and that collateral estoppel should not be applied to issues not 'in issue' and not determined in a judicial proceeding." *Rountrey v. Lee (In re Lee)*, 90 B.R. 202, 206 (Bankr.E.D.Va.1988) *citing* Restatement(Second) of Judgments § 26 Comment E (1982). In *Lee*, Judge Tice noted that if a party is given the opportunity to litigate an issue and a court makes a determination on that issue, then collateral estoppel applies. *Id.*

Here there is no dispute that the factual issues determined in the State Court Action were so decided by Judge Tyler after their actual litigation. As the Final Decree so notes, the findings of the May 21st order were arrived at after a trial on the merits. The transcript of the trial also indicates that the findings of Judge Tyler were arrived at after the conduction of actual litigation of all of the issues in the State Court Action. Accordingly, it is apparent the factual issues contained in that order were arrived at after actual litigation by both the Becketts and Bundick in the State Court Action.

### 5. Factual Issue Essential to Prior Judgment

 In order to apply the preclusive doctrine of collateral estoppel, the precise factual issue, which is the target of the collateral estoppel attack must have been essential to the prior judgment. *Glasco*, 249 Va. at 62, 452 S.E.2d at 854; *Petrus v. Robbins*, 196 Va. at 329, 83 S.E.2d at 412. The issue of non-dischargeability of a debt is exclusively a matter of federal law governed by the terms of the Bankruptcy Code. *Grogan v. Garner*, 498 U.S. at 284, 111 S.Ct. 654, *citing Brown v. Felsen*, 442 U.S. at 129–30, 99 S.Ct. 2205. The issue of the dischargeability of a debt, therefore, may never be precisely at issue in a state court proceeding. Nevertheless, the task of this Court is to determine if the issues necessary to discharge were identical were essential to the judgment entered in state court.

In this case, the Becketts are attempting to preclude from litigation the issues that they claim meet the five requirements of collateral estoppel in Virginia: 1) that Bundick engaged in improper conduct; 2) that Bundick knew that his conduct was improper; 3) that Bundick knew that his actions would cause injury to the Becketts; and 4) that Bundick's conduct did in fact injure the Becketts. Beckett Br., p. 9.

### C. § 523(a)(6) Exemptions to Discharge

 An action to determine the dischargeability of a debt under § 523(a) has two components. *Chicago Midwest Credit Service Corp. v. Trovato (In re Trovato)*, 145 B.R. 575 (Bankr.N.D.Ill.1991)(citing *Grogan v. Garner*, 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991)). The first step requires that the creditor establish that a debt is in fact owed by the debtor.

Section 101(12) of the Bankruptcy Code defines "debt" as a liability on a claim and § 101(5) defines "claim" as a right to payment. The term "claim" has been interpreted very broadly to include all legal obligations of the debtor. *Pennsylvania Dept. of Public Welfare v. Davenport*, 495 U.S. 552, 110 S.Ct. 2126, 109 L.Ed.2d 588 (1990). Whether the creditor has an enforceable obligation is determined by substantive non-bankruptcy law. *Butner v. U.S.*, 440 U.S. 48, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979). Once the creditor has established a valid claim, it is the duty of the bankruptcy court to look to the provisions of § 523(a) to determine if the debt is non-dischargeable.

■ In order to understand the impact of § 523(a)(6) on the instant case, a review of the policy underlying discharge exceptions and the case law regarding § 523(a)(6) is necessary. Congress made it a central purpose of the Bankruptcy Code to give debtors a fresh start, unburdened by the existence of old debts. In a Chapter 7 case such as this, a trustee is appointed and charged with locating, liquidating and distributing the proceeds of the debtor's nonexempt property to creditors. In return for relinquishing nonexempt property, the debtor is released for personal liability for pre-bankruptcy debts and further creditor action to collect such discharged debts is enjoined. In an effort to balance the benefits of allowing debtors to receive a fresh start with the right of creditors to collect debts, the Bankruptcy Code provides certain situations where public policy demands that a debt be non-dischargeable, the so-called "honest debtor" exceptions. *Local Loan Co. v. Hunt*, 292 U.S. 234, 54 S.Ct. 695, 78 L.Ed. 1230 (1934). It has long been the policy of Bankruptcy courts that "perpetrators of fraud are not allowed to hide behind the skirts of the Bankruptcy Code." *Foley &*

*Lardner v. Biondo (In re Biondo)*, 180 F.3d 126, 130 (4th Cir.1999)(citing *Cohen v. Cruz*, 523 U.S. 213, 217, 118 S.Ct. 1212, 140 L.Ed.2d 341 (1998)). Therefore, debts such as child support and alimony, debts incurred by fraud, student loans and criminal restitution debts, among others, are non-dischargeable in a Chapter 7 case. 11 U.S.C. §§ 523(a). Based on the pervading goal of providing debtors with the opportunity to start anew, however, these exceptions to discharge are narrowly construed against the objecting creditor and in favor of the debtor. *Gleason v. Thaw*, 236 U.S. 558, 35 S.Ct. 287, 59 L.Ed. 717 (1915); *In re Biondo*, 180 F.3d at 130(citing *Rezin v. Barr (In re Barr)*, 194 B.R. 1009, 1016 (Bankr.N.D.Ill.1996))(citing *Mayer v. Spanel Int'l, Ltd.*, 51 F.3d 670, 674 (7th Cir. 1995)).

■ The exception to discharge at issue in the current case arises under § 523(a)(6), which makes debts non-dischargeable if the debt is: "for willful and malicious injury by the debtor to another entity or to the property of another entity" 11 U.S.C. § 523(a)(6) (2003). In order to determine a debt not to be discharged under § 523(a)(6), a creditor must ultimately prove three elements: (1) the debtor caused an injury; (2) the debtor's actions were willful; and (3) the debtor's actions were malicious. *Glucona America, Inc. v. Ardisson (In re Ardisson)*, 272 B.R. 346, 356 (Bankr.N.D.Ill.2001) (citing *KingVision Pay Per View, Ltd. v. DeMarco (In re DeMarco)*, 240 B.R. 282, 287 (Bankr.N.D.Ill.1999)). Under Bankruptcy Rule 4005, the plaintiff has the burden of proving that a debt is non-dischargeable in bankruptcy and § 523(a) requires a showing of non-dischargeability by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 291, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991); *Farouki v. Emirates Bank Int'l, Ltd.*, 14 F.3d 244, 249 (4th

Cir.1994); *Combs v. Richardson,* 838 F.2d 112 (4th Cir.1988); *Whitson v. Middleton (In re Middleton),* 100 B.R. 814, 818 (Bankr.E.D.Va.1988). In *Grogan,* the Supreme Court held that the preponderance of the evidence standard best reflected the intent of Congress in establishing a balance between the debtor's interest in obtaining a fresh start and the creditor's interest in obtaining full payment of debts. *Id.* at 286, 111 S.Ct. 654. Therefore, to establish non-dischargeability under § 523(a)(6), the Becketts must prove by a preponderance of the evidence that Bundick's actions were willful and malicious.

The Becketts allege in their complaint that Bundick knew that his conduct constituted an unlawful act and that his continued use of his property to conduct vehicle repairs constitutes a willful and malicious injury, thereby prohibiting discharge under the Bankruptcy Code. It remains for this Court to determine if the findings of fact from the State Court support a finding that Bundick's actions were willful and malicious and therefore meet the requirements of § 523(a)(6).

### D. § 523(a)(6) Willful Injury

Federal bankruptcy law has long excepted from discharge those debts arising from a "willful and malicious injury" to a party or a party's property. Under § 17(a)(8) of the Code's statutory predecessor, the Bankruptcy Act of 1898, this discharge exception was generally regarded to include some types of reckless behavior. In 1904, the United States Supreme Court construed "willful and malicious" under the former Bankruptcy Act to include situations where the debtor committed criminal conversation with the claimant's wife, despite the absence of personal malovence toward the husband. *Tinker v. Colwell,* 193 U.S. 473, 485, 24 S.Ct. 505, 48 L.Ed. 754 (1904). Rather, the Court held that some acts which "necessarily impl[y] that degree of malice" make a debt nondischargeable. *Id.* The enactment of the Code in 1978 precipitated considerable debate among bankruptcy courts as to whether this implied malice standard survived the enactment of the new § 523(a)(6), despite the fact that very little language was altered from the former statute.

Prior to 1998, many courts construed the scope of what constituted a willful and malicious injury quite broadly, prohibiting the discharge of debts resulting from any intentional act, regardless of whether the debtor ever subjectively intended the resulting injury.[4] In *Branch Banking & Trust Co. of Va., Inc. v. Powers (In re Powers),* 227 B.R. 73 (Bankr.E.D.Va.1998),

---

**4.** The precise language adopted by the circuit courts as the standard for willful and malicious injury varies. See *Printy v. Dean Witter Reynolds,* 110 F.3d 853, 859 (1st Cir.1997) ("an act intentionally committed, without just cause or excuse, in conscious disregard of one's duty and that necessarily produces an injury"); *In re Stelluti,* 94 F.3d 84, 88 (2nd Cir.1996) (an intentional and deliberate act that is wrongful and without just cause or excuse, even in the absence of personal hatred, spite or ill-will); *In re Conte,* 33 F.3d 303, 308 (3rd Cir.1994) (an intentional act that is substantially certain to result in injury or where the debtor desired to cause injury); *In re Stanley,* 66 F.3d 664, 667 (4th Cir.1995)

(an injurious act, done deliberately and intentionally, in knowing disregard of the rights of others, even in the absence of subjective ill will or specific intent to injure); *In re Delaney,* 97 F.3d 800, 802 (5th Cir.1996) (an intentional act with the purpose to cause injury or one which is substantially certain to cause injury); *Vulcan Coals, Inc. v. Howard,* 946 F.2d 1226, 1228–29 (6th Cir.1991) (interpreting willful as an intentional act that necessarily produces harm and malicious as wrongful, without cause or excuse, or excessive); *In re Zelis,* 66 F.3d 205, 208 (9th Cir.1995) (an act done intentionally that necessarily produces harm without just cause or excuse); *In re Walker,* 48 F.3d 1161, 1165 (11th Cir.1995).

this Court explained the contours of § 523(a)(6) prior to 1998:

> When an act . . . was done intentionally and produced harm without just cause or excuse, it was willful and malicious for purposes of § 523(a)(6), without proof of a specific intent to injure. Intent to injure was established by showing that the debtor intentionally performed an act which necessarily caused injury or that was certain to cause injury.

*Id.* at 74 (citations omitted). Thus, prior to 1998 Bundick would not have been able to discharge his debt, even if he never intended the resulting injury to the Becketts, if this Court concluded that his actions were done intentionally and without justification.

In 1998, the Supreme Court dramatically changed the landscape of § 523(a)(6) in its decision *Kawaauhau v. Geiger*, excluding injuries resulting from reckless or negligent conduct from the provisions of § 523(a)(6). 523 U.S. 57, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998). In opposition to the earlier view taken by many courts that the term "willful and malicious" encompassed reckless or negligent conduct, the Supreme Court in *Geiger* held that § 523(a)(6) exempted only debts resulting from "acts done with the actual intent to cause injury," not intentional acts that cause injury. *Id.* at 61, 118 S.Ct. 974. In *Geiger*, the debtor was a physician who was seeking to discharge a judgment debt arising from a medical malpractice action. The debtor carried no medical malpractice insurance and the bankruptcy court found that debtor's treatment of the patient fell far below the acceptable standard of care. Based on this, the bankruptcy court found that his conduct was willful and malicious and the judgment debt was therefore nondischargeable. The District Court affirmed, but the Court of Appeals reversed.

In upholding the decision of the Court of Appeals, the Supreme Court concluded the language of § 523(a)(6) encompassed only acts done with the actual intent to cause injury, and not merely intentional acts that happen to cause injury:

> The word "willful" in (a)(6) modifies the word "injury," indicating that nondischargeability takes a deliberate or intentional *injury*, not merely a deliberate or intentional *act* that leads to injury. Had Congress meant to exempt debts resulting from unintentionally inflicted injuries, it might have described instead "willful acts that cause injury." Or, Congress might have selected an additional word or words, *i.e.*, "reckless" or "negligent," to modify "injury." Moreover, as the Eighth Circuit observed, the (a)(6) formulation triggers in the lawyer's mind the category "intentional torts," as distinguished from negligent or reckless torts. Intentional torts generally require that the actor intend "the *consequences of an act,*" not simply "*the act itself.*"

*Id.* at 61–62, 118 S.Ct. 974 (citing Restatement (Second) of Torts § 8A cmt. a (1964)). *Geiger*, therefore, rejected the argument that willful injury should be construed to include unintentional injury, noting that "[a] construction so broad would be incompatible with the well-known guide that exceptions to discharge should be confined to those plainly expressed." *Id.* at 61, 118 S.Ct. 974 (quoting *Gleason v. Thaw*, 236 U.S. 558, 561, 35 S.Ct. 287, 59 L.Ed. 717 (1915)). The Supreme Court feared acceptance of a more expansive interpretation of § 523(a)(6) would stretch the breadth of exceptions to discharge too far:

> The Kawaauhaus' more encompassing interpretation could place within the excepted category a wide range of situations in which an act is intentional, but

injury is unintended, *i.e.*, neither desired nor in fact anticipated by the debtor. Every traffic accident stemming from an initial intentional act—for example, intentionally rotating the wheel of an automobile to make a left-hand turn without first checking oncoming traffic—could fit the description. A "knowing breach of contract" could also qualify. A construction so broad would be incompatible with "well-known" guide that exceptions to discharge "should be confined to those plainly expressed."

*Id.* at 62, 118 S.Ct. 974 (citations omitted).

■ The basic tenet of *Geiger* is that in order to satisfy the requirements of § 523(a)(6), a plaintiff must plead and prove that the defendant actually intended harm, not merely that the defendant acted intentionally and the plaintiff was thereby injured. *Id.* at 61–62, 118 S.Ct. 974. The defendant must have intended the consequences of his act. *Id.* Injuries either negligently or recklessly inflicted do not come within the scope of § 523(a)(6). *Id.* at 64, 118 S.Ct. 974.

Decisions shortly after *Geiger* concluded that § 523(a)(6) required a showing of an intentional tort with a subjective standard of intent. *In re Powers*, decided by this Court, is illustrative. *Branch Banking & Trust Co. of Va. v. Powers (In re Powers)*, 227 B.R. 73 (Bankr.E.D.Va.1998). The debtor, Powers, obtained a loan from the plaintiff bank, and pledged his securities portfolio account maintained at a brokerage institution as collateral for the indebtedness. *Id.* at 74. Powers later obtained financing from a second bank to purchase a construction company, which required him to pledge the same securities. When Powers defaulted on the second loan, he delivered possession of the securities to the second bank, who liquidated the account. The plaintiff sought to deny discharge of Powers' debt to the first bank

under § 523(a)(6). This Court concluded the debt was dischargeable in light of *Geiger*:

> Likewise, this Court must apply a subjective standard of intent and determine whether the debtor, Stewart M. Powers, intended to cause injury to the plaintiff, BB & T, by delivering his Portfolio Account to First Union when BB & T had a prior security interest in the account. First, the Court must examine the intentional acts of the defendant. The defendant stipulated that he directed Paine Webber to deliver his Portfolio Account to First Union without advising BB & T. The defendant's transfer of funds was an intentional act done to subordinate the plaintiff's interest in the Portfolio Account to that of First Union. However, the debtor's intentional transfer of the plaintiff's collateral to First Union standing alone is not enough to satisfy the requirements of § 523(a)(6), when he asserted that the subordination would not injure BB & T's chances of being paid in full as he intended to pay its loan off over time. The debtor also expected to pay the First Union loan according to its terms which would have the effect of restoring the collateral to BB & T.
>
> Clearly, the defendant's act of subordinating the plaintiff's interests in his Portfolio Account was an improper act, but the Court is bound by the subjective intent of the debtor in determining whether the injury to the plaintiff was intended. However, the defendant's intent was to pay the plaintiff the balance due it, even though he subordinated its interest to First Union.

*Id.* at 76–77; *see also Roumeliotis v. Popa (In re Popa)*, 140 F.3d 317, 318 (1st Cir. 1998) (holding that although an employer's failure to carry worker's compensation insurance was an intentional act that caused injury, it was not done with the actual

intent to cause the injury and therefore was dischargeable); *Fla. Outdoor Equip., Inc. v. Tomlinson (In re Tomlinson),* 220 B.R. 134, 137 (Bankr.M.D.Fla.1998) (holding that the debtor's failure to turn over inventory proceeds pledged to a creditor to keep the business operative was not an intentional act to cause injury under § 523(a)(6)).

Applying the Supreme Court's ruling that § 523(a)(6) requires an actual intent to cause injury, the Fifth Circuit Court of Appeals held that for a debt to be non-dischargeable, a debtor must have acted with "objective substantial certainty or subjective motive" to inflict injury. *Miller v. Abrams, Inc. (In re Miller),* 156 F.3d 598, 603 (5th Cir.1998). The Fifth Circuit determined that the Supreme Court in *Geiger* had left three possible interpretations as to what level of intent was required for a finding of non-dischargeability under § 523(a)(6): "the standard might be met by any tort generally classified as an intentional tort, by any tort substantially certain to result in injury, or any tort motivated by a desire to inflict injury." That court first determined that despite the use of similar language in describing injuries under § 523(a)(6) and state tort law, § 523(a)(6) creates a narrower category of tortious conduct, concluding that "[m]erely because a tort is classified as intentional does not mean that any injury caused by the tortfeasor is willful." *Id.* at 604. The Fifth Circuit then determined that the meaning of willful and malicious in the context of § 523(a)(6), is governed by an implied malice standard. *Id.* at 605.

Under *Miller,* a debtor acts with implied malice when he acts "with the actual intent to cause injury." *Id.* at 606. This definition of implied malice is identical to the *Geiger* Court's explanation of willful injury. *Id., citing Geiger,* 523 U.S. at 61–62, 118 S.Ct. 974. Within the Fifth Circuit,

therefore, the test for willful and malicious injury under § 523(a)(6) is a single inquiry of whether there exists "either an objective substantial certainty of harm or a subjective motive to cause harm." *Id.; accord Baldwin v. Kilpatrick (In re Baldwin),* 245 B.R. 131, 136 (9th Cir. BAP 2000); *J. Bowers Constr. Co. v. Williams (In re Williams),* 233 B.R. 398, 405 (Bankr.N.D.Ohio 1999).

In an unpublished opinion, the Tenth Circuit Court of Appeals rejected the substantial certainty approach of the Fifth Circuit, concluding that "the 'willful and malicious injury' exception to dischargeability in § 523(a)(6) turns on the state of mind of the debtor, who must have wished to cause injury or at least believed it was substantially certain to occur." *Via Christi Reg'l. Med. Ctr., Inc. v. Englehart (In re Englehart),* No. 99–3339, 2000 WL 1275614, at *3 (10th Cir., Sept. 8, 2000); *see also Su v. Carrillo (In re Su),* 259 B.R. 909, 913 (9th Cir. BAP 2001).

Other courts, following the subjective formulation first adopted by the Eighth Circuit, have scrutinized the debtor's knowledge or belief concerning the consequences of his actions. The Sixth Circuit Court of Appeals has articulated that "the mere fact that [the debtor] should have known his decisions and actions put [the creditor] at risk is also insufficient to establish a 'willful and malicious injury.'" *Markowitz v. Campbell (In re Markowitz),* 190 F.3d 455, 465 n. 10 (6th Cir.1999). Instead, "[h]e must will or desire harm, or believe injury is substantially certain to occur as a result of his behavior." *Id.; see Mitsubishi Motors Credit of Am., Inc. v. Longley (In re Longley),* 235 B.R. 651, 657 (10th Cir. BAP 1999); *Via Christi Reg'l. Med. Ctr. v. Budig (In re Budig),* 240 B.R. 397, 400–01 (D.Kan.1999); *In re Williams,* 233 B.R. at 404.

The Ninth Circuit Court of Appeals has also contributed to the post-*Geiger* analysis. In *Petralia v. Jercich (In re Jercich)*, 238 F.3d 1202 (9th Cir.2001), an employer withheld wages from an employee even though the employer possessed the funds to pay. The debtor argued and the District Court agreed that the employer must have withheld the wages with the "specific intent" of harming the employee. The Circuit Court disagreed:

> We hold, consistent with the approaches taken by the Fifth and Sixth Circuits, that under *Geiger*, the willful injury requirement of § 523(a)(6) is met when it is shown either that the debtor had a subjective motive to inflict the injury *or* that the debtor believed that injury was substantially certain to occur as a result of his conduct. We believe that this holding comports with the purpose bankruptcy law's fundamental policy of granting discharges only to the honest but unfortunate debtor.

*Id.* at 1207–08. The Ninth Circuit more recently held that willfulness and malice are two separate requirements that are not to be "conflated" into a single inquiry, and made it clear that each alternative prong of the wilfulness showing must be based on a subjective standard. *In re Su*, 290 F.3d 1140, 1146 (9th Cir.2002). This standard focuses on the debtor's state of mind and precludes application of § 523(a)(6) absent a showing of actual knowledge that harm to the creditor was substantially certain. *Id.* at 1146.

### E. Malice

■■■ Within the Fourth Circuit, the malice prong of § 523(a)(6) appears unchanged since *Geiger*. As Judge Tice of this Court has explained:

> Malice does not mean the same thing for nondischargeability purposes under § 523(a)(6) as it does in contexts outside

of bankruptcy. In bankruptcy, debtor may act with malice without bearing any subjective ill will toward plaintiff creditor or any specific intent to injure same. *See In re Stanley*, 66 F.3d at 667, *citing St. Paul Fire & Marine Ins. Co. v. Vaughn*, 779 F.2d 1003, 1008–09 (4th Cir.1985). The Fourth Circuit defines malice as an act causing injury without just cause or excuse. *See In re Powers*, 227 B.R. at 73.

■■■ Based on *Geiger* and its progeny, the debtor's subjective mind set is central to the inquiry as to whether debtor acted deliberately in knowing disregard of a creditor's rights in property. In fact, a plaintiff creditor can even establish malice on an implied basis from a showing of debtor's behavior, as well as a presentation of the surrounding circumstances. *See St. Paul Fire & Marine Ins. Co.*, 779 F.2d at 1010 ("[i]mplied malice, which may be shown by the acts and conduct of the debtor in the context of their surrounding circumstances, is sufficient under ... § 523(a)(6)."); *Hagan v. McNallen (In re McNallen)*, 62 F.3d 619, 625 (4th Cir.1995). What is required is that plaintiff prove that debtor's injurious act was done deliberately, intentionally and with knowing disregard for plaintiff's rights. *See In re Stanley*, 66 F.3d at 667.

The Fifth Circuit Court of Appeals has suggested that post-*Geiger* the test for willful behavior as well as malice are essentially combined into a single inquiry:

> Turning to the meaning of "malicious," the *Miller [v. J.D. Abrams, Inc.]* court concluded Section 523(a)(6) creates an "implied malice standard." A debtor acts with implied malice when he acts "with the actual intent to cause injury." This definition of implied malice is identical to the *Kawaauhau* Court's explanation of willful injury. The test for willful and malicious injury under Section

523(a)(6), thus, is condensed into a single inquiry of whether there exists "either an objective certainty of harm or a subjective motive to cause harm on the part of the debtor."

*Williams,* 337 F.3d at 509, (quoting *Miller v. J.D. Abrams, Inc. (In re Miller),* 156 F.3d 598, 605–606 (5th Cir.1998)).

■■■ The inquiry remains is, therefore, whether Bundick's actions rise to the level of willful and malicious as defined by § 523(a)(6) and interpreted by *Geiger* and its progeny. This Court is reminded that "[s]ince a debtor in a § 523(a)(6) case is unlikely to admit that he or she intended to cause injury, or that he or she was substantially certain that injury would result, this state of mind can be established through circumstantial evidence." *In re Sweeney,* 264 B.R. at 872 (citing *Harr v. Harr (In re Harr),* 2000 WL 620799, at *6 (Bankr.S.D.Ohio 2000)).

### F. Injunction Violations as Willful and Malicious Injuries

Alternatively, this Court may find that a violation of a valid court order is sufficient to find that the debtor's actions were willful and malicious and therefore are non-dischargeable under § 523(a)(6). Judge Tyler clearly found that Bundick had violated the temporary injunction issued in the state court, stating that his award of damages was "not going to be nominal because this individual has defied this court's order and defied human decency by continuing to do what he did under these circumstance[s]. . ." Tr. at 203.

Courts have regularly found that the violation of a court's order is *per se* willful and malicious and is sufficient, in and of itself, to make a debt non-dischargeable under § 523(a)(6). One court has stated that

. . . when a court of the United States . . . issues an injunction or other protec-

tive order telling a specific individual what actions will cross the line into injury to others, then damages resulting from an intentional violation of that order (as is proven either in the bankruptcy court or (so long as there was a full and fair opportunity to litigate the questions of volition and violation)in the issuing court) are *ipso facto* the result of willful and malicious injury.

*Buffalo Gyn Womenservices, Inc. v. Behn,* 242 B.R. 229, 238 (Bankr.W.D.N.Y. 1999). That court determined a court order automatically defined what conduct is "just" between the parties and any intentional violation of that order "cannot be viewed as not having the intention to cause the very harm to the protected persons that the order was designed to prevent." *Id.*

Illustrative is *Williams v. Int'l Brotherhood of Elec. Workers, Local 520 (In re Williams),* 337 F.3d 504 (5th Cir.2003). Williams was an independent electrical contractor who operated an "open shop," employing non-union electricians. *Id.* at 506. Members of the International Brotherhood of Electrical Workers Local 520 (the "Union") applied to work for Williams on a large construction project known as the "Eckerd project," but purposefully did not disclose their union affiliation. *Id.* The union members were hired and disclosed their union affiliation prior to beginning work on the Eckerd project and requested increases in wages and benefits. Williams had used non-union wages to calculate the cost of the project and was unable to grant the requested increases. As a result, the union workers went on strike. *Id.* Williams was unable to hire non-union workers to complete the project and entered into a collective bargaining agreement ("CBA") with the union which provided that all new employees would be found exclusively through the union hiring

hall. *Id.* at 507. The Union filed a grievance against Williams and the Labor Management Committee found that he had violated the CBA by hiring non-union labor. *Id.*

The Union and Williams entered into an Agreed Final Judgment and Decree, which was approved by the District Court for the Western District of Texas. *Id.* This order provided that Williams was obligated to hire all labor for commercial projects through the Union and required an audit of Williams' records to determine past compliance. Williams subsequently violated the agreed order by hiring non-union labor to work on two commercial projects. After a complaint by the Union, the District Court held Williams in contempt of court for violating the agreed order and ordered Williams to pay $155,855.43 for the original breach of the CBA. Williams was also ordered to pay $106,911.43 in restitution for the continuing violation of the agreed order, as well as attorney's fees. *Id.*

After the District Court issued the judgment holding Williams in contempt, Williams and his spouse filed a petition for relief under Chapter 13 of the Bankruptcy Code. *Id.* The Chapter 13 petition was converted to Chapter 7 and an order of discharge was thereafter entered. *Id.* at 508. The Union filed a complaint to have the two judgment debts arising from the violation of the CBA declared non-dischargeable under § 523(a)(6) of the Bankruptcy Code. *Id.* The Bankruptcy Court held that the all three challenged debts were excepted from discharge under Chapter 7. The District Court affirmed this judgment.

On appeal, the Fifth Circuit Court of Appeals first held that the debt arising from the initial breach of the CBA was not excepted from discharge. *Id.* at 511. The Fifth Circuit found that there was no evidence that Williams' conduct in breaching the CBA was substantially certain to cause injury, and therefore held that the hiring of non-union workers in violation of the agreement was willful and malicious as required by § 523(a)(6). The Fifth Circuit did, however, find that the debt based on the violation of the agreed order was *per se* willful and malicious and therefore barred Williams from discharging the debt under Chapter 7. The court stated that "[f]ailure to obey a court order constitutes willful and malicious conduct, and a judgment against a defiant debtor is excepted from discharge." *Id.* at 512 (citing *PRP Wine Int'l v. Allison (In re Allison)*, 176 B.R. 60, 64 (Bankr.S.D.Fla.1994)). The Court stated:

> The Agreed Judgment clearly and unambiguously informed Williams that the use of non-union electricians on commercial projects was forbidden. Williams knew of his obligations under the CBA, yet he knowingly violated those obligations. Even if Williams did not intend to injure the Union, the Agreed Judgment made him substantially certain that his acts would inflict injury.

*Id.* at 512.

The determination that injunction violations are *per se* willful and malicious has been extended to state court injunctions that have been violated. *Fairway Golfview Homes, Inc. v. Kecskes (In re Kecskes)*, 136 B.R. 578 (S.D.Fla.1992). In *Kecskes*, the debtor placed liens on the plaintiff's property that were alleged to be fraudulent. The state court issued an injunction forbidding the placement of further liens. The debtor refiled the liens in violation of the state court injunction and the court amended its final judgment to award substantial compensatory and punitive damages. In the subsequent bankruptcy proceedings, the state court judgment for damages was held to be non-

dischargeable under § 523(a)(6). *Id.* at 580. The bankruptcy court concluded that the debtor intentionally violated the state court order without just cause or excuse, and that such conduct was malicious within the meaning of § 523(a)(6). *Id.* at 583; *see also The Spring Works, Inc. v. Sarff,* 242 B.R. 620, 628 (6th Cir. BAP 2000); *John Labatt Ltd. v. Messina,* 2000 WL 311145 at *9 (Bankr.N.D.Ill.2000); *Thruway Messenger Service, Inc. v. Marini,* 28 B.R. 262, 265 (Bankr.E.D.N.Y.1983); *PRP Wine Int'l, Inc. v. Allison,* 176 B.R. 60, 64 (Bankr.S.D.Fla.1994); *but see City of Colton v. Corbly (In re Corbly),* 61 B.R. 851, 857 (Bankr.D.S.D.1986)(the test for determining dischargeability was whether the contempt judgment was meant to be compensatory or to uphold the dignity of the court).

It remains to analyze the causes of action asserted in the Bill of Complaint and the specific finding of Judge Tyler against this template. The Bill of Complaint in the State Court Action asserts a variety of causes of action against Bundick.

### Intentional Infliction of Emotional Distress

 The first count in the Becketts' Circuit Court Bill of Complaint is intentional infliction of emotional distress. This tort was first recognized by the Virginia Supreme Court in *Womack v. Eldridge,* 215 Va. 338, 210 S.E.2d 145 (1974). There the court held that a plaintiff may recover damages for a non-physical tort if the plaintiff shows by clear and convincing evidence that: 1) the wrongdoer's conduct was intentional or reckless; 2) the conduct was outrageous and intolerable; 3) the wrongful conduct and the emotional distress are causally connected; and 4) that the resulting stress is severe. *Id.* at 341, 210 S.E.2d at 148; *accord Jordan v. Shands,* 255 Va. 492, 498–99, 500 S.E.2d

215, 218–219 (1998); *Russo v. White,* 241 Va. 23, 24, 400 S.E.2d 160, 162 (1991).

In *Paroline v. Unisys Corp.,* 879 F.2d 100 (4th Cir.1989), a case applying Virginia law, the Fourth Circuit Court of Appeals stated that in intentional infliction of emotional distress case:

[l]iability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!"

879 F.2d at 100, 112 (4th Cir.1989)(quoting *Restatement (Second) of Torts,* § 46, comment (d)).

 The first element is satisfied if the tortfeasor had the specific purpose of inflicting emotional distress or where he intended his conduct and knew or should have known that the emotional distress would likely result. *Womack,* 215 Va. at 338, 210 S.E.2d at 148. The second element safeguards against frivolous suits in situations where only bad manners and mere hurt feelings are involved. *Id.* The fourth prong is satisfied if "the distress inflicted is so severe that no reasonable person could be expected to endure it." *Russo v. White,* 241 Va. at 24, 400 S.E.2d at 162. Virginia courts do not favor actions for intentional infliction of emotional distress. *See Ruth v. Fletcher,* 237 Va. 366, 373, 377 S.E.2d 412, 415–16 (1989). In order to prevail in the State Court Action, the Becketts would have shown "that the conduct complained of was 'so outrageous in character, and so extreme in degree, as to be beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized

community.'" *Simmons v. Norfolk & Western Ry. Company,* 734 F.Supp. 230, 231 (W.D.Va.1990), *quoting Owens v. Ashland Oil, Inc.,* 708 F.Supp. 757 (W.D.Va. 1989).

### Negligence

The second cause of action that the Becketts asserted in the underlying state court action was negligence. Under Virginia tort law, a plaintiff has the burden of showing, by a preponderance of the evidence, the existence of a legal duty, a breach of that duty, and proximate causation resulting in damages. *Atrium Unit Owners Ass'n v. King,* 266 Va. 288, 293, 585 S.E.2d 545, 548 (2003). There is no requirement that the plaintiff show an intent to injury, but rather the lower standard that the defendant's actions fell below the acceptable standard of care and therefore caused injury to the plaintiffs.

### Nuisance

Thirdly, the Becketts alleged in the state court action that Bundick's actions constituted a nuisance. Under Virginia law, a public nuisance is an act or condition that unlawfully operates to injure an indefinite number of people, with injure including affecting the safety, health or morals of the public, or working a substantial annoyance, inconvenience or injury to the public in general. *National Organization for Women v. Operation Rescue,* 726 F.Supp. 1483, 1495 (E.D.Va.1989). A public nuisance is restricted to a condition that is "dangerous and hazardous in itself." *Taylor v. City of Charlottesville,* 240 Va. 367, 372, 397 S.E.2d 832, 835 (1990). It must prevail "at all times and under all circumstances." *Price v. Travis,* 149 Va. 536, 547, 140 S.E. 644, 647 (1927). More than sporadic or isolated conditions must be shown and the interference must be "substantial." *City of Newport News v.*

*Hertzler,* 216 Va. 587, 594, 221 S.E.2d 146, 151 (1976).

The law of private nuisance within Virginia holds that when a business enterprise, even though lawful, becomes obnoxious to occupants of a neighboring dwelling and renders enjoyment of the adjoining land, by virtue of, for example, smoke, cinders, dust, noise, offensive odors, then the operation of such business is a nuisance. *National Energy Corp. v. O'Quinn,* 223 Va. 83, 85, 286 S.E.2d 181, 182(1982); *Barnes v. Quarries, Inc.,* 204 Va. 414, 417, 132 S.E.2d 395, 397 (1963). The term nuisance includes "everything that endangers life or health, or obstructs the reasonable use of property." *Id.*

Virginia courts broadly construe an occupant's right to the "use and enjoyment of land." *Foley v. Harris,* 223 Va. 20, 28, 286 S.E.2d 186, 190 (1982). The phrase "use and enjoyment" includes the pleasure, comfort and enjoyment that a person normally derives from the occupancy of land. Freedom from discomfort and annoyance while using land, which inevitably involves an element of personal tastes and sensibilities, is often as important to a person as freedom from physical interruption with use of the land itself. The discomfort and annoyance must, however, be significant and of a kind that would be suffered by a normal person in the community. *Id.* at 28, 286 S.E.2d at 190–91 (citations omitted).

Furthermore, the location of the business enterprise or the zoning classification of the property on which the business is located is not sufficient to protect a business from a nuisance claim. Locality and surroundings are to be taken into consideration only in determining whether the business or industry is conducted in a manner constituting a nuisance as a matter of fact. It is of no conse-

quence that a business is useful or necessary to the surrounding community. *Smith v. The Pittston Company*, 203 Va. 711, 717, 127 S.E.2d 79, 83–84 (1962). In *Barnes v. Quarries, Inc.* the Supreme Court of Virginia rejected a similar argument that a nuisance was allowed by law, since it was authorized by local zoning ordinances. The Supreme Court stated that "[t]his contention is without merit. The permit did no more than allow the respondent to do what the zoning law otherwise prohibited.... It is beyond the power of a county or municipality to authorize the maintenance of a nuisance." 204 Va. 414, 417, 132 S.E.2d 395, 397.

### Trespass

 Under Virginia tort law, trespass derives from the "general principle of law [that] every person is entitled to the exclusive and peaceful enjoyment of his own land, and to redress if such enjoyment shall be wrongfully interrupted by another." *Tate v. Ogg*, 170 Va. 95, 99, 195 S.E. 496, 498 (1938). A trespass is an unauthorized entry onto property which results in interference with the property owner's possessory interest therein. 5 Richard R. Powell, The Law of Real Property, P. 707 (Patrick J. Rohan, ed., 1994). Thus, in order to maintain a cause of action for trespass to land, the plaintiff must have had possession of the land, either actual or constructive, at the time of the trespass was committed. *Blackford v. Rogers*, 2 Va. Dec. 292, 294, 23 S.E. 896, 897 (1896).

 In addition, to recover for trespass to land, a plaintiff must prove an invasion that interfered with the right of exclusive possession of the land, and that was a direct result of some act committed by the defendant. Any physical entry upon the surface of lad constitutes such an invasion, whether the entry is "a walking upon it, flooding it with water, casting objects upon it, or otherwise." W. Page Keeton et al., Prosser and Keeton on the Law of Torts § 13, at 70 (5th ed.1984). Civil liability for trespass may be predicated upon unintentional trespass. *Parker v. Hartford Fire Ins. Co.*, 222 Va. 33, 35, 278 S.E.2d 803, 804 (1981). Liability may also be imposed for actions done accidentally, inadvertently or by mistake. *Barnes v. Moore*, 199 Va. 227, 231, 98 S.E.2d 683, 686 (1957); *Clinchfield Coal Corp. v. Hayter*, 130 Va. 711, 720, 108 S.E. 854, 857 (1921). Although proof of a negligent act may be sufficient to support a civil action for trespass, such proof is not a necessary element.

### G. Application of State Law Causes of Action to § 523(a)(6)

 Based on the transcript of the trial conducted January 29, 2002 and the orders in the State Court, counsel for the Becketts urge this Court to except Bundick's debt from discharge under Chapter 7 of the Bankruptcy Code. It remains to assess the record of the State Court Action and in particular the trial transcript to determine if the necessary elements for a violation of 11 U.S.C. § 523(a)(6) were conclusively determined by Judge Tyler.

### Did Bundick Cause an Injury to the Becketts?

The first step in the analysis of whether the findings of Judge Tyler in the State Court Action mandate a ruling of non-dischargeability under § 523(a)(6) is the determination of whether Bundick engaged in an act or acts which caused an injury to the Becketts. While the exact cause of action relied upon by Judge Tyler is not expressly stated, he did, however, clearly find that the Becketts had been injured by Bundick's business operations. The Bundicks were enjoined from:

[U]sing their adjacent property in a manner which damages the Becketts' property such as permitting smoke and diesel fumes to penetrate their home even if it's inside the warehouse such as noise—a disturbance such as has been thoroughly proved in this case. That the noise is a constant nuisance to the adjacent property of the Becketts and smutting up their house with the smoke.

Tr. at 198–199. Counsel for Bundick asserts that Judge Tyler never made a finding of property damage, based on the statement from the bench that "[t]hey really haven't proved any property damages." Tr. at 200. Judge Tyler did indicate at other points in the transcript, however, that there was damage to the Becketts' property because "if the house is smutted up on the south side and there is heavy smoke from those diesels over there, then there is an inference that the smoke is smutting up the house." Tr. at 199. Furthermore, Judge Tyler clearly found that Mrs. Beckett suffered personal injury as a result of Bundick's truck repair operation:

> [I]t is very clear that Ms. Beckett did, indeed, suffer personal injury as a result of this—of this set of facts that we have here.
>
> She—she definitely was in great distress over the thing, and a substantial stress was created for her and her husband; but she particularly. Her medical condition was, indeed, exacerbated as a result of the smoke and particulate that floated into her residence; and so she did, indeed have personal injuries; and she's entitled to be compensated for them.

Tr. at 202. Based on these findings, it is clear that Judge Tyler found that the Becketts had been injured by Bundick's actions. The first requirement to preclude discharge under § 523(a)(6), that there be an act or acts which cause injury, has been satisfied.

*Were Bundick's Acts Willful?*

The second element that must be established to find that the debt in question is non-dischargeable in a Chapter 7 proceeding is that the injurious act was willful and objective or subjectively certain to cause injury. *Ardisson,* 272 B.R. at 356. While either objective or subjective knowledge of the certainty of injury can be used to support a finding of non-dischargeability, a finding of subjective knowledge obviates any need to show objective certainty. Although the transcript of the trial is unclear as to the cause of action resulting in the judgment, the transcript clearly shows that Bundick had notice of the harm that his business operation was causing. Judge Tyler specifically found that Bundick knew of the harmful effects of his business operations, stating:

> [t]here was evidence that the zoning official for the county had specifically instructed the defendant in this case not to conduct any business activities on his property, which instructions he ignored, and he also ignored this court's order. He was informed of the problems being created for the Becketts. Mr. Bundick knew it. He knew it for a long time. Ms. Beckett tried to communicate with him through his wife—through Bundick's wife. Mr. Beckett tried to communicate with him directly, and Mr. Beckett reports that Mr. Bundick just—would turn his back and walk away. As a matter of fact, the evidence was such that it seemed that one could infer that at times Mr. Bundick, would do these things just—just all at once. Run all of these machines at the same time, even though the evidence is sufficient for him to know that he was creating health and comfort problems for the Becketts. He certainly knew it after the suit was filed,

and this case is a chancery suit, and it is ongoing, and the evidence is that all the way up to today even. The witness for Mr. Bundick testified that he continues to operate his business there creating substantial stress for Gladys Beckett and her husband, Mr. Beckett.

Tr. at 194–195. Judge Tyler further found that Mrs. Beckett had "complained about that and was not given any consideration in that regard." Tr. at 196. Judge Tyler continued:

> [T]he Becketts have lived there for quite a long time peacefully until Mr. Bundick began to operate his business, and he began to operate it unlawfully in violation of both good manners—that is to say, operating a business in a residential community—and in violation of the zoning law and did so after being told not to do it; and therefore, did so on purpose knowing full well that he was adversely affecting his neighbors; and he did so in

violation of this court's order, which raises the specter of punitive damages.[5]

Tr. at 196. This continued operation was "on purpose knowing full well that he was adversely affecting his neighbors..." Tr. at 196. This behavior, Judge Tyler concluded, "defied human decency." Tr. at 203. This series of findings by Judge Tyler is clearly sufficient to show that Bundick had actual knowledge of the harm that his business operations were causing his neighbors. Judge Tyler's conclusion that Bundick's acts were in violation of law and were done "on purpose knowing full well that he was adversely affecting his neighbors" conclusively establishes Bundick's acts were willful and done with the subjective certainty to cause the injury inflicted on the Becketts. This knowledge meets the standard of subjective certainty which is necessary to declare the subsequent debt non-dischargeable under § 523(a)(6). Therefore, this Court must

---

5. The Court must rely on Judge Tyler's specific findings contained in the transcript as the finding of the existence of a basis for an award of punitive damages, which under Virginia law, standing alone, is insufficient to conclude that there was an occurrence of a willful and malicious injury. Under Virginia law, punitive damages "may be recovered only where there is misconduct or actual malice, or such recklessness or negligence as to evince a conscious disregard of the rights of others.'" *Hamilton Development Co. v. Broad Rock Club,* 248 Va. 40, 45, 445 S.E.2d 140, 143 (1994)(quoting *Giant of Virginia, Inc. v. Pigg,* 207 Va. 679, 685, 152 S.E.2d 271, 277 (1967)). The conclusion that there was willful or wanton misconduct, malice, or conscious disregard of another's rights need only be a "possible conclusion" that the finder of fact could reach, not an inevitable conclusion. *Jordan v. Neil Sauve and Koons Ford, Inc.,* 219 Va. 448, 454, 247 S.E.2d 739, 742 (1978). Behavior is considered to be willful or wanton and warrant the imposition of punitive damages if such conduct imports knowledge and consciousness that injury will result from the act done. The act done must be intended

or it must involve a reckless disregard for the rights of another and will probably result in an injury. *Infant C. v. Boy Scouts of Am., Inc.,* 239 Va. 572, 580, 391 S.E.2d 322, 327 (1990)(quoting *Friedman v. Jordan,* 166 Va. 65, 68, 184 S.E. 186, 187 (1936)). Virginia caselaw makes it plain that an award of punitive damages is warranted by malicious conduct or negligence which is willful or wanton as to evince a conscious disregard of the rights of others. *Booth v. Robertson,* 236 Va. at 273, 374 S.E.2d at 3. Furthermore, in Virginia proof of actual malice is not required to support a recovery of punitive damages. *Avocet Development Corp. v. The McLean Bank,* 234 Va. 658, 666, 364 S.E.2d 757, 762 (1988) (citing *Baker v. Marcus,* 201 Va. 905, 909, 114 S.E.2d 617, 621 (1960)). While an award of punitive damages has often been a basis to conclude the § 523(a)(6) standards have been satisfied in other jurisdictions, and particularly so pre-*Geiger,* this assessment of punitive damages in a Virginia state court is not necessarily conclusive that "willful" behavior has occurred. *Johnson v. Dade (In re Dade),* 296 B.R. 388, 392 (Bankr.E.D.Va. 2001).

conclude that Bundick's acts were willful as required under 11 U.S.C. § 523(a)(6).

## Malice

The third and final requirement for a finding of non-dischargeability is that the debtor's act must have been malicious. The determination of whether a debtor acted with malice is significantly different than the prior determination of whether the conduct was substantially certain to cause injury. *In re Powers*, 227 B.R. at 73. The malice component of § 523(a)(6) dischargeability under *Geiger* and its progeny provides that a debtor may act with malice without bearing any subjective ill will toward plaintiff creditor or any specific intent to injure same. *Id.* Malice is shown in the § 523(a)(6) context if the plaintiff proves that debtor's injurious act was done deliberately, intentionally and with knowing disregard for plaintiff's rights. *See In re Stanley*, 66 F.3d at 667. Judge Tyler clearly found that Bundick's actions met this standard of malice. The State Court found that Bundick's continued operation of the truck repair business "defied human decency." Tr. at 203. Judge Tyler further found that Bundick had knowledge that his actions were wrongful and infringed on the Becketts rights:

> the Becketts have lived there for quite a long time peacefully until Mr. Bundick began to operate his business, and he began to operate it unlawfully in violation of both good manners—that is to say, operating a business in a residential community—and in violation of the zoning law and did so after being told not to do it; and therefore, did so on purpose knowing full well that he was adversely affecting his neighbors . . .

Tr. at 196. Bundick's actions were found to be in violation of the law, in defiance of human decency, and clearly done without justification, cause or excuse. These find-

ings are sufficient to support a conclusion that Bundick's continued operation of his truck repair business was malicious.

Complicating this Court's task somewhat is the fact that Judge Tyler did not expressly identify which of the pled causes of action of the Becketts he relied upon in reaching his conclusions that the Becketts were entitled to a recovery from Bundick. However, an analysis of the trial transcript makes it possible to conclude Judge Tyler did not found his judgement on a theory such as negligence which would be precluded as a non-dischargeable under *Geiger*. From the evidence presented at trial, there is no indication that Judge Tyler relied on the negligence cause of action to impose damages. There was no implication of any negligent conduct by Bundick, but rather substantial evidence that Bundick's actions were intentional and that Bundick had knowledge of the deleterious effect on the Becketts. Judge Tyler repeatedly characterized the actions of Bundick as intentional, unlawful acts, negating any possibility of a conclusion that the injury caused to the Becketts was done negligently. Likewise, there is no evidence that Judge Tyler based his decision on the trespass cause of action. The transcript of the State Court Action indicates that Judge Tyler dismissed the allegations of trespass:

> Also, I'm not sure about this trespass business. I understand the business of a particulate floating in the air from welding, but I've already said that there is not going to be any further business—commercial—anything other than residential use on the Bundick property. So I don't need, I don't think, to enjoin against prohibiting continuing trespass. We can thing about that, but I don't think it's necessary.

Tr. at 199–200. The remaining causes of action, coupled with the findings of Judge

Tyler that Bundick's actions were willful and subjectively substantially certain to cause injury to the Becketts are sufficient for this Court to find that Bundick's conduct was willful and malicious and the ensuing debt is therefore non-dischargeable.

*Violations of the Temporary Injunction*

■ An additional basis for concluding the judgment debt of Bundick to the Becketts' is not discharged pursuant to 11 U.S.C. § 523(a)(6) is also supplied by the record of the State Court Action. Judge Tyler in the temporary injunction enjoined Bundick from "performing any welding, maintenance, or repair, or allowing any welding, maintenance, or repair" on the property of the Bundicks and further enjoined the Bundicks from "running, operating, and/or using any diesel or gasoline engines, welding equipment or any sort— regardless of whether such engine, welding equipment, or power equipment is powered by electricity, internal combustion engine, chemical reaction or any other source of power at, upon, above, around, or near Respondent's property." Temporary injunction, pp. 1–2. Judge Tyler found that actions of Bundick to be a violation of the temporary injunction, concluding that Bundick "also ignored this court's order" and undertook his actions "in violation of this court's order." Tr. at 194, 196. Furthermore, Judge Tyler's findings make it apparent he concluded this violation of the State Court's order was intentional and not inadvertent. The intentional violation of a valid court order is sufficient to find Bundick's acts were willful and malicious and therefore not discharged under § 523(a)(6). *See Williams*, 337 F.3d at 512; *Kecskes*, 136 B.R. at 583, *Sarff*, 242 B.R. at 628. Accordingly, the intentional injunction violation of Bundick found by Judge Tyler provides an additional basis to conclude the judgment debt of Bundick to the Becketts is not discharged pursuant to 11 U.S.C. § 523(a)(6).

*Punitive Damages*

■ While not raised by Bundick defensively, it remains for the Court to scrutinize whether the award of punitive damages of $10,000.00 to Mrs. Beckett may survive discharge. Punitive damages are not discharged if the conduct giving rise to the award of punitive damages sprang from the same willful and malicious conduct giving rise to the award of compensatory damages. *McNallen*, 62 F.3d at 626–27; *Ramsey v. Bernstein (In re Ramsey)*, 197 B.R. 475, 482 (Bankr.D.Md.1996); *Merriex v. Beale*

*(In re Beale)*, 253 B.R. 644, 651 (Bankr. D.Md.2000). Here the conduct which generated the award of punitive damages in the State Court Action is the identical conduct found by Judge Tyler to warrant an award of compensatory damages.[6] As such, having found the record of the State Court Action conclusively proves the actions of Bundick resulted in injury to the Becketts were willful and malicious, the award of punitive damages to Mrs. Beckett may not be discharged under § 523(a)(6).[7]

6. Judge Tyler's oral opinion contained in the transcript of the State Court Action suggests at one point that the punitive damage award to Mrs. Beckett may have arisen because of his finding of the violation of the temporary injunction. Tr. at 196. In any event, the acts of Bundick which violated the temporary injunction are the identical acts found to cause injury to the Becketts.

7. Much of the argument of Bundick here ultimately appears to be directed at the contention that Judge Tyler's findings were unsupported by the evidence at the trial of the State Court Action, and particularly the finding that personal injury was incurred by Mrs. Beckett as a result of the activities of Bundick. This argument is of no moment here, as the issue of sufficiency of the record to support the

**Summary**

The Motion for Summary Judgment of the Becketts for a declaration that the judgement entered in the State Court Action is not discharged pursuant to § 523(a)(6) of the Bankruptcy Code is granted. The underlying record of the State Court Action is sufficient to determine that Bundick's actions were willful and malicious as defined by § 523(a)(6) of the Bankruptcy Code.

**Conclusion**

For the reasons stated here, the Becketts Summary Judgment Motion is granted, and the indebtedness of Bundick to the Becketts represented by the State Court judgement is not discharged.

It is so ORDERED.

conclusions Judge Tyler is a matter of state appellate review, which has been concluded by the denial of the Writ of Appeal to the Supreme Court of Virginia. This Court's role is limited solely to determining whether Judge Tyler's now final findings are sufficient to satisfy the elements of § 523(a)(6), and not to assess whether the underlying evidentiary record of the State Court Action was sufficient to support those findings.